**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHARLISE PICKETT,               ) | |
|                   ) | |
|       Plaintiff,    ) | |
|                   ) | Case No. 15-CV-00749 |
|       v.            ) | |
|                   ) | Judge Joan B. Gottschall |
| HOUSING AUTHORITY OF COOK COUNTY   ) | |
| and RICHARD MONOCCHIO, IN HIS    ) | |
| OFFICIAL CAPACITY AS EXECUTIVE    ) | |
| DIRECTOR OF THE HOUSING AUTHORITY  ) | |
| OF COOK COUNTY,             ) | |
|                   ) | |
|       Defendants.    ) | |

## MEMORANDUM OPINION & ORDER

This 42 U.S.C. § 1983 case stems from the termination of plaintiff Charlise Pickett's ("Pickett") participation in the Section 8 Housing Choice Voucher Program (the "voucher program") run by the Housing Authority of Cook County, Illinois. She claims that the Housing Authority and its executive director, sued in his official capacity (collectively "the HACC"), violated the Fourteenth Amendment's Due Process Clause and Section 8 of the United States Housing Act of 1937 ("Housing Act"), as amended, 42 U.S.C. §1437d(k), by terminating her participation without cause and without a predeprivation hearing. Pickett and the HACC have filed cross motions for summary judgment. The court rules for Pickett on liability but declines to award declaratory and injunctive relief on the present record.

### I. BACKGROUND

#### A. Statutory and Regulatory Framework

Congress established the voucher program "[f]or the purpose of aiding low-income families in obtaining a decent place to live." 42 U.S.C. § 1437f(a) (West 2017). Subject to

regulations promulgated by the federal Department of Housing and Urban Development ("HUD"), state or local public housing agencies ("PHAs") "generally administer[ ]" the program, as the HACC does here. 24 C.F.R. 982.1(a)(1) (2002). Under the program, "HUD pays rental subsidies so eligible families can afford decent, safe and sanitary housing." *Id.*

Each PHA must adopt an administrative plan and run its program in accordance with that plan and HUD regulations. *See id.* § 982.54. Among other things, the plan must cover "[i]nformal hearing procedures." *Id.* § 982.54(d)(13).

Tenants find their own rental housing under the voucher program. *See id.* §§ 982.1(a)(2), 982.302(a). If the PHA approves the housing the tenant finds, then the PHA makes a contract with the landlord called a "housing assistance payments" ("HAP") contract under which the tenant family pays a portion of its income as rent and the PHA pays the remainder directly to the owner. *See id.* §§ 982.1(a)(2), 982.451. HUD's regulations permit the tenant to move in several circumstances, including when "[t]he assisted lease for the old unit has terminated." *Id.* § 982.354(b)(1) (West 2017) (originally enacted as § 982.314(b)(1)); *see also id.* § 982.354(c)–(e) (specifying additional conditions and authority of PHA to make certain policies governing moving).

"When a family is selected, or when a participant family wants to move to another unit, the PHA issues a voucher to the family." *Id.* § 982.302(a). The family then submits an application to the PHA to approve the rental. *See id.* § 982.302(b)–(d).

Under the HACC's program, a family requests approval by submitting a form called a "Request for Tenancy Approval" ("RFTA") once it has located a property. Defs.' Resp. to Pl.'s SOF ¶ 13, ECF No. 71. The HACC also requires the owner to complete several forms ("ownership documents"), including a W-9 form, direct deposit form, and declaration of

ownership. *See id.* ¶ 14. Together, these are commonly referred to as "moving papers." Either the owner or the tenant may submit the ownership documents (which sometimes contain the owner's personal information). *Id.* ¶ 15. "If the RFTA is completed correctly and returned to the HACC, but the ownership documents are missing, then the Housing Specialist assigned to the participant contacts the owner to request the missing documents." *Id.* ¶ 16. After the HACC receives the RFTA and all of the ownership documents, it schedules an inspection conducted by its contractor. *Id.* ¶ 17. If the property fails the inspection, the contactor notifies the owner; the tenant does not participate in the reinspection process. *See id.* ¶¶ 18–20, 22. Once the unit passes inspection, a HACC housing specialist conducts a review, negotiates the amount of rent for the unit with the owner, and prepares a HAP contract. *See id.* ¶¶ 21, 23–25. The tenant plays no role in this part of the process. *See id.* ¶¶ 22, 25, 23–25.

Provisions of the regulations governing the period of voucher validity and extensions feature prominently in this dispute. HUD regulations say that the voucher must be initially valid for at least sixty days. 24 C.F.R. § 982.303(a). Section 982.303(b) reads as follows:

> Extensions of term.
>
> (1) At its discretion, the PHA may grant a family one or more extensions of the initial voucher term in accordance with PHA policy as described in the PHA administrative plan. Any extension of the term is granted by PHA notice to the family.
>
> (2) If the family needs and requests an extension of the initial voucher term as a reasonable accommodation, in accordance with part 8 of this title, to make the program accessible to a family member who is a person with disabilities, the PHA must extend the voucher term up to the term reasonably required for that purpose.

24 C.F.R. § 982.303(b) (2002). Consistent with this provision, the HACC's 2012 administrative plan suspended the running of the voucher's expiration period while an RFTA is being processed. *See* Defs.' Resp. to Pl.'s SOF ¶¶ 31–34. The HACC "requests" that families seek an extension

before the voucher expires but looks at each request "on a case-by-case basis." *Id.* ¶ 29. By practice and partially under the terms of its administrative plan, "HACC considers the success or lack of success of the participant's housing search; any disabilities of family members which may impact the family's search time; . . . the amount of time that the family has used on the voucher . . .[; and] reasons beyond the family's control" when deciding whether to grant an extension. *Id.* ¶ 27 (internal citations omitted, some commas replaced with semicolons). The HACC's 2012 administrative plan also states that "the HACC will not issue extensions to the voucher term beyond a total of 180 days active search time." Pl.'s Resp. to Defs.' SOF ¶ 13, ECF No. 73 (citing 2012 Plan 75, 185, Ex. C) (other citations omitted). After the 180-day period expires, a manager makes the decision on whether to grant a further extension. *Id.* ¶ 15.

Two more sections of the HUD regulations must be mentioned to complete the picture: § 982.554 is titled "Informal review for applicant"; and § 982.555 is titled "Informal hearing for participant." The first provision specifies that an informal review with an opportunity to present written or oral objections is required in certain situations, *see* § 982.554(a)–(b) and (b)(2), but, among other things, "[t]he PHA is not required to provide the applicant an opportunity for an informal review for. . . [a] PHA determination not to approve an extension of the voucher term," § 982.554(c)(4). In 2013, the same held true for participant families with an important difference. *See* § 982.555(b)(4) (2013) (partially repealed by 80 FR 50575 (Aug. 20, 2015)) (PHA not required to provide informal hearing to participating family for "a PHA determination not to approve an extension or suspension of a voucher term"). But "[a] PHA must give a participant family an opportunity for an informal hearing to consider whether the following PHA decision[ ] relating to the individual circumstances of a participant family [is] in accordance with the law, HUD regulations and PHA policies: . . . . . A determination to terminate assistance for a

participant family because of the family's action or failure to act." *Id.* § 982.555(a)(1)(iv) (West 2017) (originally codified at § 982.555(a)(1)(v)).

**B. Undisputed Facts**

Except where otherwise stated, the court draws the undisputed facts from the parties' respective Local Rule 56.1 statements. Where a fact appears in more than one statement, only one statement is cited.

Pickett began participating in the HACC's voucher program in about 2002. Defs.' Resp. to Pl.'s Statement Additional Facts ¶ 1, ECF No. 76. For five years before May 2012, Pickett lived at 1021 Lioncrest, Richton Park (the "Lioncrest Unit"). Defs.' Resp. to Pl.'s SOF ¶ 35, ECF No. 71. She wanted to move to a space with more room for her children. *Id.* She obtained a voucher on May 22, 2012. *Id.* ¶ 37; Pl.'s Resp. to Defs.' SOF ¶ 9, ECF No. 73. It stated on its face that it expired on July 22, 2012. *Ibid.*

Pickett searched for housing but encountered many owners unwilling to rent to a person with a Section 8 voucher. Defs.' Resp. to Pl.'s SOF ¶ 39. She had surgery to remove a lymph node in the summer of 2012, *id.* ¶ 40, and the HACC extended the voucher's expiration date to August 22, 2012, *id.* ¶ 41.

Pickett submitted an RFTA on August 21, 2012, *id.* ¶ 42. Whether the HACC acted upon it is immaterial, *see id.* ¶ 43, because it subsequently (in October 2012) extended the voucher's expiration date to December 8, 2012, *id.* ¶ 44. Because this first request "fell through," Pickett stayed in the Lioncrest Unit. Pl.'s Resp. to Defs.' SOF ¶ 27, ECF No. 73.

Pickett submitted a second RFTA on November 21, 2012, for 22436 Lakeshore, Richton Park ("Lakeshore Unit"). Defs.' Resp. to Pl.'s SOF ¶ 46. The Lakeshore Unit failed several inspections conducted by the HACC's contractor; it finally passed inspection on January 31,

2013.  *Id.* ¶ 48.

The HACC official who was negotiating with the landlord of the Lakeshore Unit sent him a HAP contract on February 28, 2013, but he responded on March 25, 2013, that he would not be renting to Pickett.  *Id.* ¶ 53.  Pickett had already moved in by this time, Pl.'s Resp. to Defs.' SOF ¶ 32, ECF No. 73, and she started receiving letters stating that foreclosure proceedings were pending and that she had to move out.  Defs.' Resp. to Pl.'s SOF ¶ 55, ECF No. 71; *see also id.* ¶ 54 (the HACC does not know why the Lakeshore Unit's landlord decided not to rent to Pickett). After issuing an initial "expired voucher" letter in April 2013, a HACC employee gave or mailed Pickett a letter extending her voucher's expiration to June 15, 2013.  *Id.* ¶ 58.  While still trying to find housing (see the following paragraph), "because it was under foreclosure," Pickett lived rent-free at the Lakeshore Unit until April 2014.  Pl.'s Resp. to Defs.' SOF ¶¶ 36–37.

Pickett submitted her third RFTA on June 3, 2013, for 17660 Springfield Ave., Country Club Hills ("Springfield Unit").  Defs.' Resp. to Pl.'s SOF ¶ 62, ECF No. 71.  On June 28, the HACC told Pickett not to move into the Springfield Unit until the rent offer had been accepted. *Id.* ¶ 64.This proved to be good advice because the landlord sent the HACC a letter on July 9, 2013, declining to rent to Pickett.  *Id.* ¶ 65.

The HACC met with Pickett on July 26, 2013.  *Id.* ¶ 66.  It sent her a letter giving her what it calculated to be the 12 days of suspended time left on her voucher to find a place to live: until August 7, 2013.  *Id.*  The letter also included the handwritten phrase "Final, no extension given."  Pl.'s Resp. to Defs.' SOF ¶ 53, ECF No. 73; Defs.' Ex. F at 1, ECF No. 64-6.

Pickett and the landlord of the Lakeshore Unit submitted another RFTA for the Lakeshore Unit dated July 26, 2013, (the fourth one).  Defs.' Resp. to Pl.'s SOF ¶ 67; *see also* Pl.'s Resp. to Defs.' SOF ¶ 54, ECF No. 73 (disputed version of fact recited; defendant contends Pickett

brought a backdated RFTA to the HACC's offices on July 29, 2013). Pickett believed that her

landlord "had found new management and that everything with the house was fine." Defs.'

Resp. to Pl.'s SOF ¶ 68, ECF No. 71; *accord* Pl.'s Resp. to Defs.' SOF ¶ 56, ECF No. 73.

But on August 6, 2013, Pickett asked the HACC in person to cancel her RFTA for the

Lakeshore Unit and reinstate her suspended time. Defs.' Resp. to Pl.'s SOF ¶ 70. A HACC

employee amended the letter originally dated July 26, 2013, to state that the voucher now

expired on Sunday, August 18, 2013. *Id.* ¶ 71.

Pickett submitted her fifth RFTA on August 23, 2013, for 14635 Woodlawn Avenue,

Dolton ("Woodlawn Unit"). *Id.* ¶ 73. The father of Pickett's daughter was killed in a robbery,

and his body was found on August 31, 2013. *Id.* ¶ 74. Pickett had a friendly relationship with

him, although they were not romantically involved, and his death traumatized her greatly. *See id.*

¶¶ 75–76. Pickett went to the HACC office to discuss the death and the Woodlawn Unit on that

same day. *Id.* ¶ 77. Meanwhile, the HACC determined that it was missing ownership papers for

the Woodlawn Unit on August 29, 2013. Pl.'s Resp. to Defs.' SOF ¶ 65, ECF No. 73. Another

HACC employee gave Pickett until September 3, 2013, to submit ownership documents needed

for the Woodlawn Unit. *See* Defs.' Resp. to Pl.'s SOF ¶ 78, ECF No. 71. Upon learning that

ownership documents were needed, Pickett contacted the Woodlawn Unit's landlord, but the

landlord decided to rent to someone else because the other prospective tenant did not need

HACC approval, and the landlord needed the money "right away." Pl.'s Resp. to Defs.' SOF ¶

72, ECF No. 73.

The HACC's program manager mailed a "Notice of Expiration of Voucher and

Termination of Assistance Letter" to the address of the Springfield Unit. Defs.' Resp. to Pl.'s

SOF ¶ 82, ECF No. 71; Defs.' Mot Summ J. Ex. J at 1, ECF No. 64-10; *see also* Defs.' Resp. to

Pl.'s SOF ¶ 85 (Pickett never lived at the Springfield Unit).  The letter stated that Pickett "failed to locate a unit and return the required documentation within the required 150-day [sic] period," so the HACC terminated her from the voucher program.  ECF No. 64-10.[1]

Pickett appealed and requested a hearing via letter received by the HACC on September 9, 2013.  Defs.' Ex. B at 1190, ECF No. 64-2.  The HACC denied her request by letter dated November 15, 2013.  *Id.* ¶ 88; Defs.' Mot Summ J. Ex. K at 1, ECF No. 64-11.  The letter read as follows:

> The Housing Authority of Cook County (the HACC) has received your request dated September 9, 2013 to appeal the decision to terminate your participation in the Housing Choice Voucher Program.
>
> After careful review of your case, the HACC has decided to deny your request for an informal hearing.  This decision was made because:
>
> ☐ Your request was received after the deadline for an appeal.
>
> ☐ The reason for request does not require an informal hearing.
>
> ☒ Other: You were issued five extensions on your voucher search and had moving papers from May 2012 until August 2013 and you did not successfully locate a unit for approval before the extended expiration date of your voucher.

ECF No. 64-11.

"HACC regularly denies a participant's request for an informal hearing if she is terminated as the result of the voucher's expiration, although HACC will sometimes reinstate with an extension or tolling time if no extensions have been issued."  Defs.' Resp. to Pl.'s Statement Additional Facts ¶ 15, ECF No. 76 (quoting Rule 30(b)(6) deposition; internal quotation marks, ellipsis, and citations omitted).  According to her undisputed testimony, Ann Richmond, the HACC employee who prepared the letter, "marked the 'Other' box on the November 15, 2013 letter and not the 'The reason for request does not require an informal

---

[1] It is not clear how Pickett learned of the Notice of Expiration.

hearing.' box, even though the second box applied because only the 'Other' box allowed her to type the detailed reasons a hearing would not be held." Pl.'s Resp. to Defs.' SOF ¶ 78, ECF No. 73 (citing Richmond Dep., 39:24–40:20) (other citations omitted). The HACC decided in its discretion not to give Pickett a further extension because she "was not living in a rental unit for which a subsidy was being paid for an extended period of time and [because Pickett] had received several extensions or tolling time on her voucher already." *Id.* ¶ 79.

## C. Procedural History

With the assistance of counsel, Pickett filed this lawsuit in 2015. The HACC moved to dismiss, and Pickett sought a preliminary injunction. This court considered many of the arguments made in the pending motions in its opinion entered July 10, 2015. *Pickett v. Hous. Auth. of Cook Cnty.* ("*Pickett I*"), 114 F. Supp. 3d 663 (N.D. Ill. 2015), Slip Op., ECF No. 24. In *Pickett I*, the court denied the HACC's motion to dismiss the complaint for failure to state a claim, granted Pickett's request for a preliminary injunction, and ordered the HACC to provide her with a hearing to consider its decision to terminate her participation in the voucher program. Slip Op. at 17. The court concluded its opinion by "not[ing] that discovery may very well prove critical in this case" and listing several matters that "may bear" on Pickett's claims. *Id.* at 16–17. Rather than hold a hearing, the HACC reinstated Pickett's participation in the voucher program. Defs.' Resp. to Pl.'s Statement Additional Facts ¶ 18, ECF No. 76.

A discovery dispute erupted in 2016 with the filing of Pickett's second motion to compel. ECF No. 51 (filed Apr. 29, 2016). The HACC and Pickett narrowed the issues, and at a hearing held June 16, 2016, the court resolved what remained. *See* Minute Entry, ECF No. 56. The court denied Pickett's motion to compel "with the understanding that Defendant will not present an 'overly burdensome' defense to Plaintiff's claims" by which the court meant a defense to

Pickett's due process claim that holding a post-deprivation hearing would be overly burdensome. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, "the nonmoving party[–but] only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation and footnotes omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted).

Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citing *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 824 F.3d 645, 647–48 (7th Cir. 2016)). The court must separately apply the procedural requirements of Rule 56 to each cross motion for summary judgment. *See id.*; *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Each movant and nonmovant "must individually satisfy the requirements of Rule 56." *United Transp. Union v. Ill. Cent. R.R. Co.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998) (citing *Proviso Ass'n of Retarded Citizens v. Vill. of Westchester*, 914 F. Supp. 1555, 1560 (N.D. Ill. 1996) and *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Kelly*, No. 95 C 501, 1996 WL 507258, *3 (N.D. Ill. Sept. 4, 1996)). Regarding the material factual contentions, the court adopts "a dual, 'Janus-like' perspective" on cross motions aimed at the same claim or defense. *Hotel 71*, 778 F.3d at 603 (citing *Shiner v. Turnoy*, 29 F. Supp. 3d 1156, 1160 (N.D. Ill. 2014)). On one motion, the court views the facts and inferences in the light most favorable to the nonmovant; but if summary judgment is not warranted, the court changes tack on the cross motion and gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* (citing *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150*, 335 F.3d 643, 647–48 (7th Cir. 2003)). Which party has the burden of proof at trial determines which party must "go beyond the pleadings and affirmatively . . . establish a genuine issue of material

fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 324).

## III. ANALYSIS

Neither Pickett nor the HACC argues that a material factual dispute exists, and the material facts in the parties' Local Rule 56.1 statements are undisputed. Instead, they disagree about what the governing legal rules are: Did the Due Process Clause require a pre-termination hearing? And did the HACC violate 42 U.S.C. § 1437d(k)? Hence the court resolves the questions of liability presented here at summary judgment because both sides "have responded to the cross-motions for summary judgment relying on the same undisputed [material] facts; [and] each party asserts that those facts necessarily lead to judgment in its favor." *Santaella*, 123 F.3d at 465 (directing entry of summary judgment on cross motions for this reason); *see also Wilson v. Baptiste*, No. 13 CV 07845, 2016 WL 3878125, at *2 (N.D. Ill. July 18, 2016) ("Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." (quoting *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012)). While the court enters summary judgment for Pickett on liability, it declines to award her the injunctive and declaratory relief she seeks on the present record.

### A. Due Process Claim

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Pickett brings a procedural due process claim here, contending that she was entitled to a hearing before the HACC terminated her participation in the voucher program. A procedural due process claim raises two questions: "(1) is there a property or liberty interest protected by

due process; and (2) if so, what process is due, and when must that process be made available?" *Simpson v. Brown Cnty.*, 860 F.3d 1001,1006 (7th Cir. 2017). The plaintiff therefore has the burden to prove "(1) that he was deprived of a protected liberty or property interest, and (2) that he did not receive the process that was due to justify the deprivation of that interest." *Armato v. Grounds*, 766 F.3d 713, 721–22 (7th Cir. 2014).

The question here is whether, on the undisputed facts, Pickett had a property interest protected by the Fourteenth Amendment. *See Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) ("[A] plaintiff asserting a procedural due process claim must have a protected property interest in that which he claims to have been denied without due process." (citing *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007)). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bell v. City of Country Club Hills*, 841 F.3d 713, 717 (7th Cir. 2016) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). The due process clause does not create the property interests it protects; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (quoting *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011)). Nevertheless, "federal constitutional law determines whether [an] interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)) (emphasis and other citation omitted). The analysis begins by determining what state or federal law confers on the plaintiff. *See id.*

1. <u>Pickett's Interest in the Voucher Survived the Termination of Assistance Payments</u>

The HACC allows that Pickett may have possessed a property interest in program participation until 2013, but any interest she had dissipated in or around March of that year when she stopped receiving assistance payments. Even though 40–50% of the HACC's participants move before the unit's HAP contract is finalized,[2] Pl.'s Resp. to Defs.' SOF ¶ 8, ECF No. 73, the regulations and the HACC administrative plan do not appear explicitly to address that circumstance—or at least the parties have not directed the court to the place where they do. The summary judgment record establishes that Pickett's assistance payments stopped because she had moved, but her HACC-approved new landlord decided not to sign the lease and HAP contract after she moved. *See* Defs.' Resp. to Pl.'s SOF ¶¶ 53–56, ECF No. 71.

The HACC's cessation of assistance payments did not terminate all protections the Fourteenth Amendment afforded Pickett. The Seventh Circuit has held that participants in the Voucher Program "who have been issued a certification for rent assistance have a property interest in the assistance and must be heard before being expelled from the program . . . ." *Khan,* 630 F.3d at 527 (citing *Simmons v. Drew,* 716 F.2d 1160, 1162 (7th Cir. 1983)); *see also Bhattacharya v. Chi. Hous. Auth.*, No. 14 C 9693, 2017 WL 1197095, at *9 n.6 (N.D. Ill. Mar. 31, 2017) ("[A]s a low-income tenant determined by the CHA and HUD to qualify for income-based housing benefits, Plaintiff has a legitimate claim of entitlement to pay no more in rent than what may be charged under [an amendment to the Housing Act]."). On the other hand, applicants for Section 8, even those "who have been deemed eligible[,] do not have a protected right that entitles them to due process when they are denied a specific Section 8 housing unit

---

[2] The HACC claims that it discourages this practice, but Pickett disputes that claim. Pl.'s Resp. to Defs.' SOF ¶ 7. Pickett testified that a HACC employee told her that she could move into the Lakeshore Unit on February 13, 2013, but that fact is also disputed. Defs.' Resp. to Pl.'s SOF ¶ 51, ECF No. 71. The court finds neither dispute to be material because, as explained in the text *infra*, the fact that the HACC subsequently extended the expiration date of Pickett's voucher is undisputed. *Id.* ¶ 58.

because landlords have considerable discretion in making final tenancy decisions." *Khan*, 630 F.3d at 528 (citing *Fincher v. S. Bend Heritage Found.*, 606 F.3d 331, 333–34 (7th Cir. 2010)). Nevertheless, in *Simmons*, the Seventh Circuit made clear that the Fourteenth Amendment protects more than the right to receive assistance payments: "just as job tenure is a species of property protected by the Fourteenth Amendment, so too is 'program tenure,' the right of certificate holders to participate in a rent assistance program by seeking out persons willing and able to rent them housing pursuant to the rules of the program." *Simmons*, 716 F.2d at 1162 (citing *Perry v. Sindermann,* 408 U.S. 593 (1972) and *Ferguson v. Metro. Dev. & Hous. Agency*, 485 F. Supp. 517 (M.D. Tenn 1980)). That is, once issued, a voucher at a minimum entitles an applicant to something protected by the Fourteenth Amendment: the chance to search for suitable housing under the program's rules. *Id.*

HAP payments may cease for any number of reasons. A fire might leave a Section 8 family homeless, for instance. If the lease terminates automatically, the homeless family might not receive assistance anymore. If the HACC's position were to be accepted, the house fire would vitiate all of the family's property interests related to the Section 8 program. The case law says otherwise. At minimum, if the family had an unexpired voucher, it would still have a legitimate entitlement to search for a place to live under the program's rules. *See id.*

So did Pickett, because she had an unexpired voucher after her assistance payments ceased. The HACC extended the date on which Picket's voucher expired on April 15, 2013. Defs.' Resp. to Pl.'s SOF ¶ 58, ECF No. 71. With all extensions granted by the HACC, it facially expired no earlier than August 18, 2013. *See* Defs.' Resp. to Pl.'s SOF ¶¶ 58, 66, 71, ECF No. 71. Until its expiration date, Pickett's voucher gave her a property interest in "seeking out" a place to live under the program's rules, even though she was no longer receiving assistance

payments.  *See Simmons*, 716 F.2d at 1162 ("[U]ntil the certificate expires, it gives the family the right to continue participating in the program so long as the PHA lacks just cause to expel it."); *see also Fincher*, 606 F.3d at 332 (recognizing that *Eidson v. Pierce*, 745 F.2d 453 (7th Cir. 1984), which arose under a predecessor Section 8 program controlled analogous question raised by participant in the voucher program); *Luvert v. Chi. Hous. Auth.*, 142 F. Supp. 3d 701, 714 n.8 (N.D. Ill. 2015) (relying on *Simmons* "because the 'certificates' mentioned there have since been merged with the vouchers at issue in this lawsuit [and] [b]efore that merger the same rules governed the expiration of both certificates and vouchers" (internal citations omitted)).

2. HUD Regulations Do Not Create a Property Interest in a Hearing

The parties disagree about whether HUD regulations required an informal hearing in this situation.  As this court explained in *Pickett I*, 114 F. Supp. 3d at 669–70, § 982.555 is arguably internally inconsistent.  On the one hand, it requires an informal hearing for terminations based on a family's "action or failure to act."  24 C.F.R. § 982.555(a)(1)(iv).  On the other hand, a PHA need not hold an informal hearing on a "determination not to approve an extension or suspension of a voucher term."  *Id.* § 982.555(b)(4).  The tension here results from the fact that when a voucher expires, the family has always failed to act, and the PHA always has the discretionary power to extend the voucher's term.  *See id.* §982.303(b)(1).  Hence an informal hearing appears both to be required and not to be required by § 982.555.

In *Pickett I*, the court found the fact that the box on the November 15, 2013, letter stating that an informal hearing was required was not checked.  This fact and the HACC's briefing suggested at that stage that the HACC terminated Pickett's participation in the voucher program for a failure to act.  *See Pickett I*, 114 F. Supp. 3d at 670.  In undisputed testimony, Richmond, the HACC employee who prepared the letter, stated that she believed that no informal hearing

was required but checked the box for "other" because she needed the space to explain her reasons. *See* Pl.'s Resp. to Defs.' SOF ¶ 78, ECF No. 73. Richmond's subjective beliefs about what process is due do not alter the court's analysis.

The HACC cites a number of decisions relying on the pre-2015 version of § 982.555(b)(4) and 982.303(b) to argue that a program participant has no property interest after a voucher expires because decisions to extend or suspend were at the relevant time discretionary. *See, e.g.*, *Ely v. Mobile Hous. Bd.*, 605 F. App'x 846, 850–51 (11th Cir. 2015) (per curiam, unpublished) (also finding notice given was sufficient); *Augusta v. Cmty. Dev. Corp. of Long Island*, 363 F. App'x 79, 80 (2d Cir. 2010); *Burgess v. Alameda Hous. Auth.*, 98 F. App'x 603, 605 (9th Cir. 2004).

This court cannot give the regulation's pronouncements on when an informal hearing is required dispositive weight on the question, however. The existence or nonexistence of specific procedural guarantees bears on the question of whether a substantive property or liberty interest exists, but it cannot be dispositive. *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir. 1982). In *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983), the Supreme Court had to decide whether a regulation requiring a particular type of hearing before a prisoner was transferred from one facility to another created a property interest. Answering no, the Court explained that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id.* (citation omitted) (other citation omitted). Because state officials had unfettered discretion to decide where to transfer a prisoner, a regulation prescribing that a particular type of hearing be held did not create a liberty or property interest in holding the hearing, and so the regulation requiring a certain kind of hearing created no liberty or property interest the Fourteenth Amendment would recognize. *See id.* at 250–51

("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." (footnote omitted)).

Applying that reasoning here, HUD regulations may extend or withdraw the right to a hearing for reasons unrelated to protecting substantive rights (in the Fourteenth Amendment sense of "substantive"). As the regulations are not dispositive on whether a hearing is required, the court looks beyond § 982.555 to determine whether Pickett has a protected property interest. *See id.*; *Kim Constr. Co. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1248 (7th Cir. 1994) (paraphrasing *Olim*'s holding as "an expectation that a particular procedure will be followed is not, without more, an interest protected by the Due Process Clause").

3. Pickett Had Protected Property Interest in Mandatory Suspension that Survived Voucher Expiration

Besides the regulations governing when an informal hearing is required, Pickett identifies another potential regulatory source of a property interest, one not considered in *Pickett I*. Pickett reads §§ 982.552–53 as listing an exhaustive set of grounds for terminating program participation. *See* 24 C.F.R. § 982.555(a)(iv) (citing § 982.552 and requiring informal hearing). As voucher termination is not on the list, she reasons that participants have a property interest in program participation separate from voucher expiration.[3]

Pickett cites two cases reversing a PHA's decision to expel a family from a voucher program to support her position that §§ 982.552–53 are exhaustive and exclusive. In the first

---

[3] As HACC's 2012 plan recognizes, "HUD regulations specify the reasons for which the HACC can terminate a family's assistance and the ways in which such terminations must take place." 2012 Plan at 205, ECF No. 64-3 Ex. C. HUD's regulations include a list of circumstances in which termination is mandatory, *see* 24 C.F.R. §§ 982.552(b), 553, and discretionary, *id.* § 982.552(c). Mandatory termination occurs in specified circumstances for things such as illegal drug use or criminal activity. *Id.* § 982.553. Examples of listed grounds for discretionary termination include "[i]f the family violates any family obligations under the program," § 982.552(c)(1), and "[i]f the family has engaged in or threatened abusive or violent behavior toward PHA personnel," *id.* § 982.552(c)(1)(ix).

case, *Carroll v. Chicago Housing Authority*, an Illinois appellate court overturned a PHA hearing officer's decision to expel a person from the voucher program based on a four-year-old conviction for driving under the influence of alcohol. *See Carroll v. Chi. Hous. Auth.*, 30 N.E.3d 326, 328–330 (Ill. App. Ct. 2015) (describing testimony and evidence presented at informal hearing). *Carroll* held that one ground on which the hearing officer relied, the participant's failure to notify the housing authority of her conviction, found no support in the HUD regulations, so it was not a permissible basis for terminating her participation. *Id.* at 333. Further, the *Carroll* court ruled that insufficient evidence supported the hearing officer's termination decision for reasons listed in § 982.552. *See id.* The second case also considered whether the PHA had the authority to terminate program participation based on two provisions of § 982.552(c) for a participant's incorrectly listing her minor sons as household members on an application form. *See Smith v. Hamilton Cnty.*, 2007-Ohio-1725 ¶ 1 (Ohio Ct. App. 2007). This court has no quarrel with the reasoning of either case, but neither involved voucher expiration and the possibility that expiration itself may be a ground for program termination.

Contrary to Pickett's position, this court recognized in *Pickett I* that setting an expiration date for a voucher itself suggests that its holder's expectations of receiving benefits after that date will be circumscribed at best. In *Pickett I*, this court agreed that the HACC's argument that the voucher's expiration terminated any property right she had would "make[ ] sense in a situation where an individual receives a voucher, makes no attempt to obtain housing, and fails to submit a premise for the housing agency's approval before the voucher expires." 114 F. Supp. 3d at 668; *see also Luvert*, 142 F. Supp. 3d at 711–12 (surveying the regulatory scheme and concluding that "HUD manifestly intended that a voucher's expiration should operate to drop an otherwise eligible family from the program").

While voucher expiration in a purely discretionary regime may affect the holder's participation tenure in some situations, her legitimate claim of entitlement to continued program participation does not vanish in a puff of smoke at the stroke of midnight on the expiration date stated on the voucher. The Seventh Circuit has repeatedly analogized a voucher holder's interest to the tenure rights of public employees. *Pickett I*, 114 F. Supp. 3d at 668 (citing *Khan*, 630 F.3d at 527–28; *Simmons*, 716 F.2d at 1162–63; and *Holbrook v. Pitt*, 643 F.2d 1261, 1277 (7th Cir. 1981)). In tenure cases, the "lack of formal contractual or tenure security in continued employment . . . is highly relevant to [the plaintiff's] procedural due process claim[, b]ut it [is] not entirely dispositive." *Perry*, 408 U.S. at 599. In *Perry*, a professor at a junior college's contract had expired, but he alleged that "his interest in continued employment . . ., though not secured by a formal contractual tenure provision, was secured by a no less binding understanding fostered by the college administration." *Id.* He pointed to a provision in the college's employee handbook and state-wide guidelines for junior colleges he contended amounted to a "de facto tenure" provision. *See id.* at 599–600. The Supreme Court reversed entry of summary judgment for the college, because the professor "alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause." *Id.* at 602–03.

Consistent with *Perry*, Pickett has established, by pointing to explicit rules promulgated by the HACC, that she had a justified claim of entitlement to continued program participation after her voucher's facial expiration date. *See Pickett I*, 114 F. Supp. 3d at 668–70. First, the HACC's administrative plans make clear that termination of what *Simmons* described as "program tenure" and voucher expiration are separate concepts. The HACC's administrative plan contemplates the possibility that a family with a transfer voucher will stay in a subsidized

rental while it searches for another place to live.  If the voucher expires, "the family may remain

in its current unit with continued voucher assistance if the owner agrees and the HACC approves.

Otherwise, the family will lose its assistance."  2012 Admin. Plan at 185, ECF No. 64-3.  While

the HACC's decision to approve continued assistance may be discretionary, this language makes

clear that program termination does not inevitably follow a voucher's expiration.  *See id.*

More to the point for Pickett, the HACC adopted a mandatory policy constraining its

discretion to enlarge the date on which a voucher expires.  The version of the HUD regulations in

effect on September 3, 2013, gave a PHA discretion over decisions on whether to extend a

voucher and whether to suspend it while a tenant's application for tenancy was pending.  *See* 24

C.F.R. § 982.303(b)(1), (c).  The HACC elected to make suspension, but not extension,

mandatory in its administrative plans.  It used the following language:

> When a Request for Tenancy Approval (RFTA) and a proposed
> lease are received by the HACC, the term of the voucher will be
> suspended while the HACC processes the request. "Suspension"
> means stopping the clock on a family's voucher term from the time
> a family submits the RFTA until the time the HACC approves or
> denies the request[.]
>
> When the HACC denies a request for tenancy, the family will be
> notified immediately that the clock on the voucher term has
> restarted. The notice will include the new expiration date of the
> voucher.

2012 Plan at 76, ECF No. 64-3; 2013 Plan at 78, ECF No. 68-8.

By adopting this language, the HACC made a discretionary decision under the HUD

regulations mandatory.  The HACC used the word "will" to mandate suspension of the voucher's

term upon occurrence of fixed predicate: the submission of an RFTA.  *See, e.g.*, *Hewitt v. Helms*,

459 U.S. 460, 471–72 (1983) (holding that state statutes stating that "certain procedures 'shall,'

'will',' or 'must' be employed" created protected liberty interest because "the repeated use of

explicitly mandatory language in connection with requiring specific substantive predicates

demands a conclusion that the State has created a protected liberty interest"); *cf. Luvert*, 142 F. Supp. 3d at 711 (concluding that PHA's have "complete freedom" over "extensions *that are made discretionary*" (emphasis added)). Put another way, the HACC's suspension requirement provided "a framework of factual conditions that could be explored at a due process hearing." *Fincher*, 606 F.3d at 336 (explaining that "[a] neutral hearing officer could find certain facts and order a remedy"); *see also Eidson*, 745 F.2d at 459–60 (tracing test to *Geneva Towers Tenants Org. v. Federated Mortg. Investors*, 504 F.2d 483, 494–95 (9th Cir. 1974) (Hufstedler, J., dissenting)). When a voucher holder submits an RFTA before the date on which the voucher facially expires, then, a voucher holder has a legitimate claim to be entitled to a suspension under the HACC's plans.

Because she submitted one RFTA before her voucher's expiration date, Pickett had a legitimate claim of entitlement to a suspension. The summary judgment record confirms that she submitted no less than four RFTAs while her voucher was facially valid. The parties dispute whether the HACC's administrative plan required it to suspend her voucher from November 21, 2012, when she submitted the RFTA for the Lakeshore Unit, through April 15, 2013, when it extended her voucher. Defs.' Resp. to Pl.'s SOF ¶ 59, ECF No. 71. If suspension was required, her voucher would not yet have expired on September 3, 2013, and the predicate for her program termination would have collapsed. The court need not resolve that dispute, but it underscores that Pickett possessed a property interest because the issue could have been resolved by applying fixed criteria at a due process hearing. *See Fincher*, 606 F.3d at 336.

So the HACC's administrative plans created a constitutionally protected property interest. The plans gave voucher holders a legitimate claim of entitlement to a suspension in every case in which the voucher holder submitted at least one RFTA before the voucher's expiration date. *See*

*Pickett I*, 114 F. Supp. 3d at 670 ("[A] participant who is actively engaged in seeking housing for PHA approval, and who is otherwise in compliance with the PHA's policies, has a legitimate expectation of remaining in the program.").  Under HUD regulations promulgated after the events of this case, PHAs' discretion to decide whether to grant suspensions has been removed; HUD regulations now mandate suspensions in the same circumstances the HACC's 2012 and 2013 administrative plans did (and in other circumstances as well).  Housing Choice Voucher Program: Streamlining the Portability Process, 80 Fed. Reg. 50564-01, 50565–66 (Aug. 20, 2015) (codified at 24 C.F.R. § 982.303(b)(2), (c)) (West 2017).  The amended regulations have no bearing on Pickett's case, so the court does not consider them.

### 4. Pickett was Entitled to Notice and an Opportunity to be Heard

The court deals here with a termination of program participation for the stated reason that Pickett failed to 'lease up' before her voucher expired.  *See* Defs.' Resp. to Pl.'s SOF ¶¶ 83–84, 89, ECF No. 71.  Program termination deprives a voucher holder of the ability to continue to seek and apply for a subsidized rental.  *See* 24 C.F.R. 982.552(a)(3) (defining "termination" to include "refusal to enter into a HAP contract").  That is, termination necessarily works a deprivation of the property interest recognized in *Simmons*.  Whether termination is allowed depends on whether the voucher expired.  And whether the voucher expired depends on whether the mandatory suspension policy was correctly applied.  If it was applied incorrectly and the voucher has not yet expired, the predicate for termination and the deprivation of the interest recognized in *Simmons* collapses.

From this syllogism, it follows that the HACC had to afford notice and the opportunity for a hearing to voucher holders who submitted at least one RFTA during the voucher's term.  This would certainly be true if Pickett had been receiving assistance payments.  *See Goldberg v.*

*Kelly*, 397 U.S. 254, 264 (1970) (holding that "when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process"). As it happens, she fell into a crack in the regulatory scheme by which a landlord's refusal to sign a HAP contract left her without a place to live and also without assistance payments, but the HACC suggests no reason why that happenstance should affect the amount of process she was due. The court sees none, especially given that Pickett's status only made her situation more urgent. *See Goldberg*, 397 U.S. at 264 (reasoning that evidentiary hearing was required because "[f]or qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care").

**B. The Housing Act**

The parties also cross-move for summary judgment on Pickett's claim under the Housing Act, *see* 42 U.S.C. § 1437d(k). The provision of the Housing Act on which Pickett relies tells HUD to require PHAs to adopt "an administrative grievance procedure under which tenants will . . .[, among other things,] be advised of the specific grounds of any proposed adverse public housing agency action." § 1437d(k)(1). In *Pickett I*, this court determined that Pickett stated a claim under § 1437d(k) "that HACC's termination decision was arbitrary and capricious because it was predicated on incorrect grounds and may have resulted from HACC's failure to follow its own procedures." *Pickett I*, 114 F. Supp. 3d at 671 (citing *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298–99 (5th Cir. 2014)). "The only Court of Appeals statements of the law regarding Section 1437d(k) are unanimous in treating it as the source of a private right to grievance procedures." *Luvert*, 142 F. Supp. 3d at 712 (collecting cases).

1. Pickett is a "Tenant" Under the Housing Act Even Though Her Lease Had Been Terminated

In its motion for summary judgment, the HACC contends that the undisputed evidence shows that Pickett was not a "tenant" within the meaning of § 1437d(k). It says that the court

need look no further than what it deems the plain meaning of the word "tenant," which it reads in isolation.

When § 1437d(k) is read together with the subsection it cross references, the HACC's interpretation of the word "tenant" cannot be supported. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (quoting *Senne v. Vill. of Palatine*, 695 F.3d 597, 601 (7th Cir. 2012) (en banc)). Subsection 1437d(k)(2) guarantees a tenant the right to "have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (l)," which specifies certain requirements for leases utilized by the PHAs. The deadlines in subsection (l) include a requirement that the PHA "give adequate written notice of termination of the lease." § 1437d(l)(4) (specifying time period ranging from fourteen to thirty days). If the statute is read as the HACC proposes, a person formerly receiving assistance would have no claim if the PHA failed to provide the notice required by § 1437d(l)(4) by, say, terminating the lease in three days or one day or immediately because the lease termination would end her status as a tenant. But § 1437d(k)(2)'s incorporation of minimum-notice rules shows plainly that Congress intended them to be enforceable, so § 1437d(k) must be read to give people formerly receiving assistance under a HAP who claim that their pre-termination notice was defective the right to sue. Pickett falls into that category, so the HACC's motion for summary judgment dismissing her Housing Act claim must be denied.

2. Pickett's Request for Summary Judgment is Granted

Pickett's motion for summary judgment on her Housing Act claim brings the court back to an issue it found nondispositive in its due process analysis; the question of whether the HUD

regulations entitled Pickett to a pre-termination hearing based on her "failure to act." 24 C.F.R. § 982.555(a)(iv). Because the undisputed material facts at summary judgment do not vary materially from those Pickett alleged in her complaint, the court has already answered this question in the affirmative. *See Pickett I*, 114 F. Supp. 3d at 669–70.

The only thing Pickett adds in her motion for summary judgment is that the HACC's decision was not based on the preponderance of the evidence, as § 982.555(e) requires. That is true in every circumstance in which the PHA does not provide a required hearing, and the court does not see what it adds here.

## IV. REMEDY

Pickett asks the court to enter broad declaratory and injunctive relief to prevent future violations. *See* Mem. Supp. Mot. Summ. J. 25–27, ECF No. 67. Though she mentions damages for her Housing Act claim, she makes no effort to prove that she sustained any specific amount of damages. *See id.* at 23.

The HACC contends that the court will "in essence" be declaring HUD's regulations it views as not requiring a hearing unconstitutional, and so the court cannot award the relief Pickett requests before she gives the notice required by Federal Rule of Civil Procedure 5.1. That rule requires a party to file and serve a notice of constitutional question, when among other things, "a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity." Fed. R. Civ. P. 5.1(a)(1)(A); *see also id.* R. 5.1(d) (failure to file notice, or of court to certify issue, "does not forfeit a constitutional claim"). Even as the HACC frames Pickett's requests for declaratory and injunctive relief, she claims that regulations, not statutes, are unconstitutional. *See* Defs.' Resp. to Pl.'s Mot. Summ. J. 8, ECF No. 69 (plaintiff seeks to invalidate "HUD regulations and the HACC policies, based on

the pertinent HUD regulations"). Even if Rule 5.1 covered challenges to regulations, the court does not understand Pickett to be asking to strike anything from the Code of Federal Regulations. Rather, she wants the court to declare that the due process clause fills any gap that the regulations leave. *See Peruta v. Cnty. of San Diego*, 771 F.3d 570, 577 (9th Cir. 2014), *vac'd by grant of reh'g en banc*, 781 F.3d 1106 (9th Cir. 2015) (finding no Rule 5.1 certification required because "the opinion never 'draws into question' the 'constitutionality' of any California statute—it only questions San Diego County's exercise of regulatory authority under such state statutes").

Turning, then, to the requests for relief themselves, several factors bear on whether a declaratory judgment should issue; they include:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

*Molex Inc. v. Wyler*, 334 F. Supp. 2d 1083, 1088 (N.D. Ill. 2004) (quoting *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 579 (7th Cir. 1994)). Parties do not have a right to a declaratory judgment; "a request for [declaratory] relief is addressed to the sound discretion of the district court." *Id.* (citing *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 682 (7th Cir. 1992)). This court also has discretion to decide whether to grant permanent injunctive relief. To obtain a permanent injunction, a plaintiff ordinarily "must satisfy a four-factor test . . . : (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Pickett discusses neither set of factors in her motion for summary judgment and reply. To the extent that she devotes her argument to the scope of appropriate relief she "appear[s] to presume that an injunction is the proper remedy for a [due process] violation except in unusual circumstances. No such thumb on the scales is warranted." *Monsanto Co.*, 561 U.S. at 157.

Furthermore, granting declaratory and injunctive relief is inappropriate on this record. The due process and statutory violations the court has found depend on the HUD regulations and the HACC administrative plans in effect in 2012 and 2013. As discussed above, the regulations have since changed in ways that may be material. *Compare* 24 C.F.R. § 982.303(b)–(c) (2013), *with ibid.* (West 2017). This record also says nothing about the contents of the HACC's current administrative plan. As the current plan and regulations govern the program prospectively, issuing a prospective injunction based on four-year-old rules would be wholly inappropriate. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) ("a court abuses its discretion where the scope of injunctive relief exceeds the extent of the plaintiff's protectible rights." (internal quotations and alteration omitted)). Similarly, if a declaratory judgment for Pickett is to establish the legal rights and obligations that will govern the parties' relationship in the future, as Pickett suggests, *see Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002), then the judgment must properly account for the program as it is now rather than as it was under a prior plan and set of regulations. Otherwise, a declaration that Pickett was entitled to notice and an opportunity for a hearing under the regulations in effect in 2013 would be of little use should a similar dispute between her and the HACC erupt in the future.

That brings the court to a final, and equally important, problem: the need to demonstrate a realistic possibility of recurrence sufficient to give Pickett standing to obtain declaratory and injunctive relief. This court cannot ignore its obligation to determine that it has subject matter jurisdiction to award declaratory and injunctive relief. *See, e.g.*, *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (noting on appeal of preliminary injunction that "issues of subject matter jurisdiction are always on the table in federal courts" and holding that plaintiff asserting due process claim likely lacked standing to obtain declaratory and injunctive relief); *Tobin v. City of Peoria*, 939 F. Supp. 628, 634 (C.D. Ill. 1996) (in actions for declaratory relief, court "should be 'particularly vigilant' to make certain the case is ripe"). The question of whether this court has jurisdiction to award declaratory relief "turns on whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Molex Inc.*, 334 F. Supp. 2d at 1086 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Similarly, "[t]o have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic*, 851 F.3d at 738 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Any future briefing on injunctive and declaratory relief must address standing. The HACC reinstated Pickett's tenure in the voucher program after this court ordered it to hold an informal hearing at the preliminary injunction stage. Defs.' Resp. to Pl.'s Statement Additional Facts ¶ 18, ECF No. 73. Pickett asserts that she "realistically faces the events of 2013 repeating themselves in the future," but she cites no evidence to support her assertion. Mem. Supp. Mot. Summ. J. 27, ECF No. 67. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present

adverse effects." *Simic*, 851 F.3d at 738 (quoting *Lyons*, 461 U.S. at 95–96). Without individual standing, debates about whether broader relief should issue become academic. *See id.* at 740 ("[The plaintiff's] lack of standing to seek injunctive relief also means that she may not seek that relief on behalf of the putative class she alleged in her complaint."). The question of Pickett's continuing standing to seek injunctive and declaratory relief must therefore be addressed before any such relief can issue.

## V. CONCLUSION

For the reasons stated, the HACC's motion for summary judgment (ECF No. 64) is denied, and Pickett's motion for summary judgment (ECF No. 66) is granted in part and denied in part. A status conference is set for October 11, 2017 at 9:30 a.m.


Dated: September 27, 2017        _____/s/_____
                 Joan B. Gottschall
                 United States District Judge